1  **MINA HAKAKIAN (SBN 237666)**
   mhakakian@wwlawcorp.com
2  **WILLIAMS WOLLITZ HAKAKIAN PC**
   1539 Westwood Blvd., Second Floor
3  Los Angeles, California 90024
   Tel.: (310) 982-2733
4
   Attorneys for Plaintiff,
5  **CALIFORNIA SPINE AND**
   **NEUROSURGERY INSTITUTE d/b/a SAN**
6  **JOSE NEUROSPINE**

7
                **UNITED STATES DISTRICT COURT**
8                **NORTHERN DISTRICT OF CALIFORNIA**

9
   **CALIFORNIA SPINE AND**              Case No.: 5:24-cv-06860
10 **NEUROSURGERY INSTITUTE** dba
   **SAN JOSE NEUROSPINE**, a California
11 Corporation,

12              Plaintiff,
                                         **COMPLAINT FOR RECOVERY OF**
13      vs.                              **BENEFITS UNDER 29 U.S.C. §**
                                         **1132(A)(1)(B), BREACH OF**
14                                       **FIDUCIARY DUTIES UNDER 29**
   **GLOBAL MEDICAL RESPONSE,**          **U.S.C. § 1132(A)(3), AND**
15 **INC.; BLUE CROSS BLUE SHIELD**      **REASONABLE ATTORNEY'S**
   **OF TEXAS,** a Texas Non-Profit      **FEES AND COSTS UNDER 29**
16 Organization; and **BLUE CROSS OF**   **U.S.C. § 1132 (G)(1)**
   **CALIFORNIA dba ANTHEM BLUE**
17 **CROSS**

18              Defendants.

19

20

– 1 –

Plaintiff, California Spine and Neurosurgery Institute dba San Jose Neurospine, a California corporation, (herein referred to as "Plaintiff," "SJN," and/or "Dr. Onibokun"), alleges against Defendants Global Medical Response Inc. ("Global Medical Defendant" and/or "Global Medical"); Blue Cross Blue Shield of Texas ("BCBS-TX Defendant" and/or "BCBS-TX") and Blue Cross of California dba Anthem Blue Cross ("Anthem Defendant" and/or "Anthem") (for easy reference the Global Medical Defendant, BCBS-TX Defendant and Anthem Defendant are collectively referred to as "Defendants") as follows:

## I. **INTRODUCTION**

1.      Plaintiff SJN, an out-of-network surgery center which received valid assignment of benefits for surgeries performed, seeks redress on behalf of a patient plan member for two separate types of harms: (1) improper denials of medical insurance benefits and (2) violations of owed fiduciary duties by Defendants. The industry-standard method is for out-of-network medical providers to quickly verify insurance benefits (assurance of coverage and payment for providers' services) for a prospective patient's insurance either by speaking directly with their insurance plan's claim administrator and/or representative or by obtaining the information through the insurance portal to verify coverage and determine benefits amounts. Defendants have exploited this standard, practical, patient-friendly system by professing to specific reimbursement rates and coverage of surgeries, only to later

1   deny and severely underpay providers, such as Plaintiff after the surgeries were

2   performed.  De minimis payments, if granted, are offered after those owed, such as

3   Plaintiff, tackle unnecessary delays, and blatantly incorrect claim processing.

4   Explanations for Defendants' underpayment, if offered fall dangerously below the

5   laws set forth by the Employee Retirement Income Security Act of 1974 (ERISA)

6   standards and contain falsities. Plaintiff is informed and believes that Defendants

7   unlawfully retain Plan funds that are due and owing to Plaintiff for valid medically

8   necessary services rendered and use those funds for alternative purposes while

9   obstructing Plaintiff's access to those funds by simultaneously violating fiduciary

10   rights, which are to be guaranteed by ERISA law. Plaintiff's situation highlights the

11   need for steady, meaningful ERISA regulatory enforcement to guarantee true

12   consumer protection.

13   **II.   <u>JURISDICTION AND VENUE</u>**

14       2.      This Court has subject matter jurisdiction over this action pursuant to

15   28 U.S.C. § 1331 because the action arises under the laws of the United States of

16   America, and pursuant to 29 U.S.C § 1132 (e)(1), because the action seeks to enforce

17   rights that are guaranteed under ERISA law.

18       3.      This Court is the proper venue for the action pursuant to 28 U.S.C. §

19   1391(b) because a substantial part of the events or omissions giving rise to the claims

20   alleged herein occurred in this Judicial District where the breaches took place, and

1 because the Defendants conduct a substantial amount of business in this Judicial

2 District.

3 **III. PARTIES**

4       **a. The Plaintiff**

5     4.    SJN is a corporation organized under the laws of the state of California,

6 with its principal place of business located in the Northern District of California. Dr.

7 Abebukola Onibokun is the founder, owner, and principal surgeon of SJN. Dr.

8 Abebukola Onibokun also performed the surgery event giving rise to this action.

9     5.    SJN provides world-class spinal expertise and treatment to its patients,

10 specifically in the field of minimally invasive surgery. SJN specializes in ultra-

11 sophisticated and top-tiered surgical procedures involving minimally invasive and

12 motion preserving spinal decompressive, endoscopic spinal fusion, and complex

13 spinal reconstruction techniques, as well as the most modern in robotic computer

14 assisted image guided surgeries. SJN and its principal, Dr. Onibokun, are in the

15 business of changing and saving lives. Numerous video testimonials from Dr.

16 Onibokun's patients exist attesting to their newfound and often immediate ability to:

17 regain feeling in limbs, stand, walk, do daily activities, play with their children,

18 exercise, and even return to work as a direct result of their surgery at SJN by Dr.

19 Onibokun.[1]

20 _____

[1]    Patient Success Stories, Patient Success Stories - San Jose Neurospine in San

6.       Dr. Onibokun is among our nation's top neurosurgeons and a master of minimally invasive spine surgery.  Before founding and directing SJN, he served as the chief of neurosurgery at Elmhurst Memorial Hospital in Chicago where he established their program for minimally invasive spine surgery program.  He also served as a Health System Clinician at the Northwestern Medicine Regional practice. Dr. Onibokun has been recognized by Becker's Spine Review's "36 Spine Surgeons Under 40 to Know."  This prestigious recognition is a national list based on publicly solicited recommendations and editorial research that recognizes and honors young surgeons who are leaders in their field.  Dr. Onibokun has co-authored sentinel articles on minimal invasive spinal surgery techniques.  The first-ever article defining the anatomic considerations for cervical pedicle screw insertion using multiplanar CT measurements was grounded on Dr. Onibokun's research.  He has won America's Top 5% Most Honored Professional Award as well as multiple state "Patient Choice Awards" and state level awards such as "Most Compassionate Doctor Awards."

7.       Dr. Onibokun holds high honors in top national neurosurgery training programs.  He is certified by the American Board of Neurological Surgery, completed a residency in Neurosurgery at UCLA Medical Center, which is

Mateo and Santa Clara counties - Cupertino, South San Francisco, Silicon Valley, Atherton, Campbell, https://sanjoseneurospine.com/about/patient-testimonials.html (last visited Feb 2, 2024).

consistently ranked as one of the top five United States neurosurgery programs, and is fellowship trained in neurological surgery. He graduated with Alpha Omega honors from Northwestern University Medical School after completing his undergraduate studies at Iowa State University, graduating *Magna Cum Laude*. Beyond his academic achievements, he is deeply engaged in the community, actively participating in prominent professional organizations such as the American Association of Neurological Surgeons, the Congress of Neurological Surgeons, and the North American Spine Society.

8.     Despite conducting well over 2,000 successful surgical operations, Dr. Onibokun resolutely practices and advocates for careful consideration before engaging in surgery for his patients. SJN's website states, "Philosophically, Dr. Onibokun emphasizes conservative treatment options prior to considering spine surgery." The SJN brochure reiterates "Dr. Onibokun strongly believes in exploring non-surgical treatments first, prior to considering surgical interventions." The SJN brochure goes on to detail that, "If non-surgical options fail to relieve symptoms, SJN emphasizes minimally invasive spine surgery." [2] Dr. Onibokun's philosophy is also exemplified on the website in its unique offering of a publicly available

---

[2]     San Jose Neurospine Pamphlet, https://sanjoseneurospine.com/images/spine-surgeon-minimally-invasive-spine-surgery-san-jose-redwood-city-dr-onibokun.pdf (last visited Feb 2, 2024).

content-rich online spine encyclopedia featuring free self-help materials for back and neck symptoms, including a symptom chart, medical animations, exercise library, proper lifting techniques, pain prevention and pain relief. SJN even also offers a free home remedy book for people suffering from neck and back pain to achieve the optimal healthcare practices through "educating healthcare consumers."[3]

### i.   **Patient Plan Member: Patient ASH-GIA**

9.     Plaintiff is informed and believes that Dr. Onibokun provided surgical services for a patient who was an active member of the Global Medical Response Inc. Welfare Benefits Plan and Flexible Benefits Plan ("Global Medical Plan" and/or "Plan") during the Patient's perspective date of service of December 14, 2023. For privacy reasons, the Patient for whom Dr. Onibokun provided surgical services to is designated as Patient ASH-GIA ("Patient" or "Patient ASH-GIA".)[4]

10.     Patient ASH-GIA properly conveyed and transferred all pertinent rights to Plaintiff SJN, through valid written assignments, including but not limited to her

---

[3]     Home remedy book, Home remedies for back pain and neck pain - San Jose, Santa Clara, San Mateo, Redwood City, Menlo Park, Palo Alto, Mountain View - San Jose Neurospine, https://sanjoseneurospine.com/forms/a_hrb.html (last visited Feb 2, 2024).

[4]     To protect the privacy of Patient ASH-GIA, her name and identifying details are omitted from this Complaint. Plaintiff will disclose the identifying information to Defendants in compliance with a Protective Order and will seek to ensure that Patient ASH-GIA's information remains confidential and subject to appropriate protective measures throughout the course of this litigation in this Court.

1  healthcare benefit coverage rights, rights to insurance, rights to healthcare plan

2  reimbursement, rights to appeal, and rights to sue.  The Assignments of Benefit for

3  Patient ASH-GIA is attached as Exhibit 1 to this Complaint.

4  **b. The Defendants**

5  **i. Global Medical Defendant**

6  11.    Plaintiff is informed and believes that the Global Medical Plan is a

7  single employer self-funded employee benefit plan established to provide health

8  benefits for employee participants and their dependents.  The Global Medical Plan

9  is sponsored by Global Medical Response Inc. and is administered and managed by

10  Global Medical Defendant. Plaintiff is informed and believes that the Plan is

11  intended to be and is governed by ERISA. Global Medical Defendant is responsible

12  for all administrative functions of the Plan, including transparent and prompt review

13  and reimbursement of medical claims as well as the disclosure of necessary

14  information to Plan participants and beneficiaries in accordance with ERISA.

15  Plaintiff is informed and believes that Global Medical is a designated and acting

16  fiduciary of the Plan and is entrusted with all ERISA defined fiduciary duties, acting

17  prudently and in the interest of Plan participants and beneficiaries.

18  12.    Plaintiff is informed and believes that Global Medical Response, Inc.

19  operates as a medical transportation company with nearly 36,000 employees.  Global

20  Medical delivers medical care, primarily in the areas of emergency and patient

1  relocation services in the United States.  Global Medical was formed by combining

2  ground, managed, medical transportation, and community, industrial/specialty and

3  wildland fire services[5].  Plaintiff is informed and believes that Global Medical

4  Response Inc. has its corporate headquarter at 4400 State Highway 121, Lewisville,

5  TX 75056.

6          13.     Plaintiff currently does not have possession of the Global Medical Plan.

7  During its administrative process of Patient ASH-GIA's claim, Plaintiff requested a

8  full copy of the Global Medical Plan from Defendants in this action on three separate

9  occasions.  Defendants have failed to completely respond to this request and have

10  failed to provide a copy of the Plan.

11          14.     Plaintiff is informed and believes that the Plan offered by Defendants

12  are PPO High Plan as evidenced by the Patient's Insurance Card and covered

13  medical services at 50% of Allowed Amount.  Plaintiff is informed and believes that

14  Defendants have failed to process Plaintiff's claims in accordance with the Plan

15  terms.

16          15.     Plaintiff is informed and believes that Global Medical Plan has hired

17  third-party administrators BCBS-TX Defendant and Anthem Defendant to assist

18

19  _____

20  [5]     Global     Medical     Response     About     us     page     at
   https://www.globalmedicalresponse.com/about/overview   (last visited September
   24, 2024)

– 9 –

1   with claim administration services for the Plan.  Plaintiff is informed and believes

2   that the actions taken by BCBS-TX and Anthem on behalf of the Plan and/or in the

3   administration of the Plan are also the full responsibility of Global Medical

4   Defendants and are considered jointly committed by Global Medical Defendants, as

5   the Global Medical Defendants hired BCBS-TX Defendant and Anthem Defendant

6   to assist in processing the Plan member's claims and oversaw BCBS-TX and

7   Anthem's claim processing.  Plaintiff is informed and believes that Defendants

8   jointly exercised control over the determination and payment of benefit claim

9   submitted by Plaintiff SJN.  A summary of Plaintiff's billed charges and Defendants'

10  partial payment of Patient ASH-GIA's claim is attached as Exhibit 2 to the

11  Complaint.

12           **ii.  <u>BCBS-TX Defendant</u>**

13       16.    Plaintiff is informed and believes that BCBS-TX is a division of Health

14  Care Service Corporation, a Mutual Legal Reserve Company, an independent

15  licensee of the Blue Cross Blue Shield Association. BCBS-TX is the largest health

16  insurance company in the state of Texas with over five million members in all two

17  hundred fifty-four Texas counties and offers a wide array of insurance products,

18  including group health plans, individual policies, and government programs such as

19  Medicare Advantage.

20       17.    Plaintiff is informed and believes that BCBS-TX is an independent

– 10 –

licensee of the Blue Cross Blue Shield Association (The "BCBS Association"). Each BCBS Association member-insured is able to utilize other BCBS Association licensees' provider networks and provider discount when a member-insured works or travels outside of the state in which his/her health insurance policy is written. This nationwide program of cooperation among BCBS Association member is referred to as the "Blue Card Program".

18.     Plaintiff is informed and believes that BCBS-TX has a longstanding history of administering healthcare plans, including the Global Medical Plan and as a third-party administrator, and is responsible for critical functions such as processing and adjudicating claims, determining the eligibility of services for coverage, and issuing payments to healthcare providers.

### iii.     Anthem Defendant

19.     Plaintiff is informed and believes that Blue Cross of California is a licensee of the Blue Cross Association and uses "Anthem Blue Cross" as its trade name. Plaintiff is informed and believes that Defendant Anthem is a California corporation, headquartered in Oakland, California and doing substantial business in the State of California. As one of many entities utilizing some form or derivative of the corporate names "Anthem Blue Cross," "BlueCross," "BlueShield," or "BlueCross BlueShield," Defendant Anthem operates on a joint and cooperative nationwide basis as a licensee the BCBS Association. The names and symbols of

– 11 –

1   BlueCross BlueShield are registered trademarks of the BCBS Association, and the

2   nationwide business activities of Anthem are carried out in California and other

3   states in accordance with and pursuant to the licensing provisions and rules of the

4   BCBS Association.

5        20.    Plaintiff is informed and believes that Anthem is in the business of

6   providing health insurance plans to individuals and corporations residing and/or

7   doing business in California and throughout the United States. Anthem also services

8   employer health insurance plans in California and throughout the United States, such

9   as Global Medical by functioning as the employer health insurance plan's claims

10   administrator, insurance underwriter, and/or funding entity. Corporate health

11   insurance plans that are developed, implemented, underwritten, and/or administered

12   by Blue Cross Blue Shield entities, such as Global Medical, are typically subject to

13   and governed by ERISA. Large employee benefit funds, such as Global Medical,

14   generally structure their ERISA plans to provide health insurance for employees

15   wherever they may live, work, or travel to maintain full access to benefits and

16   compensate Anthem to assist with this endeavor.

17        21.    Plaintiff is informed and believes that Anthem services for Global

18   Medical, included deciding and/or participating in determining pre-authorization of

19   benefits, verification of benefits, whether healthcare benefits claims will be paid to

20   members, and the specific payment amount granted (if any) directly from the Global

1  Medical fund.

2  **IV.    THE BLUE CARD PROGRAM AND THE HANDLING OF THE**

3  **PLAINTIFF'S CLAIM THROUGH THE BLUE CARD PROGRAM**

4    22.    The Blue Card Program links physicians, facilities and other healthcare

5  professionals and independent Blue Cross and/or Blue Shield Plans, across the

6  country and abroad with a single electronic network for claims processing and

7  reimbursement. The Blue Card program eliminates the need for the patients and

8  physicians to deal with multiple Blue Plans. The program allows physician/patients

9  to submit all types of claims for out-of-state members directly to the local Blue Plan.

10  Through the Blue Card Program, members traveling or living outside their Plan's

11  service area receive PPO-level benefits when they need services.

12    23.    Under the Blue Card Program, Blue Cross Blue Shield entities

13  throughout the United States are supposed to act in concert with one another in the

14  business of processing, managing and paying medical provider claims. The

15  enrollment card issued to each ERISA Plan member-patient by a Blue Cross Blue

16  Shield entity instructs the member-patient to submit his or her healthcare claim to

17  the local "Host" Blue Cross Blue Shield named entity in the state where the medical

18  services were performed. The Blue Card "Host" is the BCBS entity in the area where

19  the healthcare services are rendered, which in this case is Anthem.

20    24.    Plaintiff is informed and believes that Anthem did the verification and

benefit eligibility analysis for the claim at issue in this case.   The claim was originally submitted by Plaintiff to Anthem for claim processing through Anthem, acting in its capacity as "Host" entity for the Global Medical Plan underwritten by BCBS-TX which acted on behalf of the "Home" entity that issued the Global Medical Plan.

25.    Plaintiff is informed and believes that Anthem, BCBS-TX and Global Medical all had actual control and responsibility of making benefits determinations for the healthcare services claim of Plaintiff.

## V.    CORE FACTS UNDERLYING SJN'S CLAIMS FOR PAYMENT

26.    Before Plaintiff SJN provided surgical services to Patient ASH-GIA, SJN verified her insurance coverage.  Patient ASH-GIA presented her insurance card for SJN, which indicated membership in the Global Plan. A photocopy of Patient ASH-GIA insurance card is attached to this Complaint as Exhibit 3.  The insurance card directed providers to submit all medical claims to the local BCBS Plan.  The insurance card on its face also provided the following information:

- Coverage Date: 1/1/2020
- Plan Type: PPO High Plan
- Office Visit: 20% after meeting the medical deductible
- Urgent Care: 20% after meeting the medical deductible
- Emergency Room: $200 plus deductible and coinsurance
- Prescription Generic Copay: $15 after meeting the pharmacy deductible
- Prescription Brand Copay: $40/$80

27.    Prior to providing services, it was SJN's custom and practice to verify

benefits and coverage by contacting the numbers provided for verification on the Patient's Insurance Card.  In this case, SJN encountered difficulty reaching a live representative for direct confirmation of payment percentages and insurance benefits under the individual's specific policy. Therefore, SJN utilized the online portal known as Availity to obtain the necessary information regarding out-of-network benefits.  SJN verified coverage and benefits through Availity.com at https://www.availity.com/eligibility-and-coverage/.  A print-up copy of the verification is attached as Exhibit 4 to this Complaint.

28.   Plaintiff is informed and believes that Availity, LLC is an independent company that provides administrative support services on behalf of Anthem Blue Cross.  Plaintiff is informed and believes that through Availity, providers can have real-time, online discussions and get faster access to questions they have about prior authorization, appeal status, claims, benefits, eligibility, and more.[6] Anthem's website describes Availity as follows: "Many of the tools you need - such as eligibility and benefits inquiry, claims submission, claims status inquiry and authorizations - can now be accessed by logging into the Availity Portal."[7]

---

[6]   Anthem Blue Cross Provider Chat at: https://providers.anthem.com/docs/gpp/CA_CAID_PU_ProvideChatFlier.pdf   (last visited September 23, 2024)

[7]   *Learn About Availity*, ANTHEM BLUE CROSS AND BLUE SHIELD, https://providers.anthem.com/california-provider/resources/learn-about-availity (last visited June 1, 2024)

1      29.    Through the out-of-network online portal, Availity, Plaintiff confirmed

2  several critical details regarding Patient ASH-GIA's insurance coverage.

3  Specifically, Plaintiff verified that Patient ASH-GIA was insured under the Global

4  Medical Response Inc. group, with Anthem Blue Cross listed as the payer. The portal

5  confirmed that the current Plan had an effective date of January 1, 2020. The portal

6  indicated that the out-of-network family deductible was $10,000.00 and the

7  individual deductible was $5,000.00. The Co-insurance for out-of-network was

8  stated at 50%. Coinsurance is the patient's share of the cost of a covered healthcare

9  service, calculated as a percentage of the Allowed Amount for the services.[8]

10  Allowed Amount is the maximum payment that the plan will pay for a covered

11  healthcare service.

12      30.    On December 5, 2023, SJN properly informed Patient ASH-GIA that

13  SJN was an out-of-network provider and was not participating with Patient ASH-

14  GIA's insurance. SJN provided Patient ASH-GIA with a "Surgery Cost Estimate

15  and Out-of-Network Consent Form" informing Patient ASH-GIA of its cost of

16  surgery and out-of-pocket as well as deductible. Patient ASH-GIA signed the

17  Surgery Cost Estimate and Out-of-Network Consent Form on the same day and

18  consented to receiving medical services from SJN as an out-of-network provider.

19

20  [8]    https://www.healthcare.gov/sbc-glossary/ (last visited September 24, 2024)

1   A copy of the Form is attached hereto as Exhibit 5.

2       31.    Based on the reasonable expectation that Defendants would adhere to

3   their own stated coverage terms and reimbursement rates, which were officially

4   represented through Defendants' online portal service and the patient's insurance

5   identification card, SJN proceeded to provide necessary medical services to Patient

6   ASH-GIA. SJN would not have provided surgery services but for these advance

7   coverage representations by Defendants.

8       **a. <u>Patient ASH-GIA Properly Conveyed Valid Assignments of</u>**

9       **<u>Benefits, Transferring All Of Her Pertinent Rights To SJN</u>**

10      32.    Patient ASH-GIA effectively conveyed a valid assignment of benefits

11  which transferred all rights pertinent to reimbursement and recovery, as well as owed

12  fiduciary duties by the serving insurer and plan administrator, regarding the services

13  SJN provided. (Ex. 1) The assignment conveyed and transferred to SJN all the

14  Patient's healthcare benefit coverage rights, rights to insurance, and right to

15  healthcare plan reimbursement.  The assignment encompassed all rights to appeal

16  and/or litigation and designed SJN as the Patient's authorized representative.

17      **b. <u>SJN Performed Medically Necessary Surgical Services</u>**

18      33.    Patient ASH-GIA, a 40-year-old female, presented at SJN with neck

19  pain, upper extremity numbness and patellar hyper-reflexia.  An MRI of the cervical

20  spine revealed the Patient had C5-6 posterior paracentral cervical disc herniation and

– 17 –

moderate C5-6 central canal and bilateral C5-6 foraminal stenosis as well as C6-7 right paracental cervical disc herniation and moderate C6-7 central canal stenosis. Patient ASH-GIA filled out the SJN Packet, detailing the reasons Patient ASH-GIA sought SJN services including symptoms, pain information, previous tests, current health, and family history.  (The SJN packet is attached to the Complaint as Exhibit 6).  In the "Your Symptoms" section, Patient ASH-GIA reported experiencing neck pain for seven to twelve weeks with pain radiating past elbow.  Patient ASH-GIA indicated that her arm would go numb and that she had a dull pain that radiated into the arm.  She also complained that she had weakness in her arm and had received a steroid injection for the pain as well as gabapentin, and Dexampethasone injection. Additionally, Patient ASH-GIA indicated that she had received physical therapy for the pain. An MRI revealed C5-6 posterior paracentral cervical disc herniation and moderate C5-6 central canal and bilateral C5-6 foraminal stenosis as well as C6-7 right paracental cervical disc herniation and moderate C6-7 central canal stenosis. Due to the presence of mild myelopathy symptoms and cord compression, a surgical intervention was warranted by SJN.

34.    On December 14, 2023, with the informed consent of Patient ASH-GIA duly obtained, Dr. Onibokun successfully performed a neurosurgical operation on the Patient. The procedures undertaken by Dr. Onibokun included the following:

1. C5-6 and C6-7 anterior cervical discectomies and bilateral C5-6 and C6-7

– 18 –

1    anterior cervical foraminotomies

2    2.  C5-6 and C6-C7 total disc arthroplasty using the LDR spine Mobi-C

3        artificial disc implants

4    3.  Use of the operating microscope, microdissection technique

5   A full Operative Report for Patient ASH-GIA is attached hereto as Exhibit 7.

6   **VI.  <u>SJN SUBMITTED SUFFICIENT CLAIM FORM WHICH</u>**

7   **<u>CONTAINED USUAL, CUSTOMARY, AND REASONABLE</u>**

8   **<u>CHARGES FOR PATIENT ASH-GIA SERVICES TO DEFENDANTS</u>**

9       35.     SJN submitted an industry-standard Form 1500 Health Insurance Claim

10  Form, approved by the National Uniform Claim Committee (NUCC), to

11  Defendants.[9] Claim Form is attached as Exhibit 8.  The relevant information for

12  Patient ASH-GIA, SJN, and the procedures performed on Patient ASH-GIA was

13  accurately completed on the Claim Form. Boxes 12 and 13 were appropriately

14  signed, signifying authorization for processing the claim and for the disbursement

15  of medical benefits. Additionally, Box 27 was properly marked 'yes', which notified

16  the Defendants that the claim was being processed by way of assignment from the

17  onset of the claim being submitted.   The Claim was accepted by the Defendants for

18

19  _____

    9       The claim was submitted to Anthem at P.O. Box 60007, Los Angeles, CA

20  90060-0000 which is the local plan per the instruction on the Patient ASH-GIA's
    insurance card.

1  processing.  The Claim Form included all information necessary to support SJN's

2  claim for payment and enable Defendants to process and pay SJN's claim in ordinary

3  course.

4      36.    On December 19, 2023, SJN submitted the Claim Form for Patient

5  ASH-GIA's December 14, 2023 surgery.  The total billed charged for the medical

6  procedures in question, which amounted to $85,500.00, was precisely detailed on

7  the submitted Claim Form 1500.  The Current Procedural Terminology (CPT)[10]

8  Codes were listed on the Claim Form as follows:

9  Table 1: Form 1500 for Patient ASH-GIA

| DATE OF SERVICE FROM | DATE OF SERVICE TO | PLACE OF SERVICE | CPT CODE | DIAGNOSIS POINTER | CHARGES |
|---|---|---|---|---|---|
| 12/14/23 | 12/14/23 | 22 | 22856[11] | A | $62,500.00 |
| 12/14/23 | 12/14/23 | 22 | 22858[12] | A | $20,500.00 |
| 12/14/23 | 12/14/23 | 22 | 69990[13] | A | $2,500.00 |

11      37.    The charges for the surgical healthcare services submitted by SJN to

12  Defendants were consistently aligned with the standards of usual, customary, and

[10]    CPT Codes are medical codes maintained by the American Medical Association through the CPT Editorial Panel. CPT Codes describe medical, surgical, and diagnostic services and is designed to communicate uniform information about medical services and procedures among physician, coders, patient accreditation organizations, and payors for administrative, financial, and analytical purposes.

[11]    CPT Code 22856 was utilized for billing for C5-C6 and C6-C7 anterior discectomies and bilateral C5-6 and C6-7 anterior cervical foraminotomies.

[12]    CPT Code 22858 was utilized for billing for C5-C6 and C6-C7 total disc arthroplasty using the LDR spine Mobi-C artificial disc implants.

[13]    CPT Code 69990 was utilized for billing for use of operating microscope, microdissection technique.

1  reasonable rates. These charges were in accordance with SJN's established fee

2  structure for non-Medicare patients covered by insurance entities other than

3  Defendants.

4  **VII.**  **DEFENDANTS VIOLATED ERISA STANDARDS BY ISSUING**

5  **SEVERELY DEFICIENT EOB CONTAINING FALSE AND**

6  **MISLEADING INFORMATION**

7      38.     Under ERISA, "every employee benefit plan must establish and

8  maintain reasonable claims procedures governing the filing of benefit claims,

9  notification of benefit determinations, and the appeal of adverse benefit

10  determinations," and claim procedures will <u>only</u> be deemed "reasonable" upon

11  <u>complete</u> compliance with "this section."  29 C.F.R. section 2560.503-1 (b).  29

12  C.F.R. section 2560.503-1(1)(l) instructs that if a plan fails to consistently adhere to

13  all of the listed requirements, "a claimant shall be deemed to have exhausted the

14  administrative remedies available under the plan and <u>shall be entitled to pursue any</u>

15  <u>additional remedies under section 502(a) of the Act on the basis that the plan has</u>

16  <u>failed to provide a reasonable claims procedure that would yield a decision on the</u>

17  <u>merits of the claim.</u>" (Emphasis added).

18      39.     Defendants violated 29 C.F.R. section 2560.503-1 by issuing a severely

19  deficient EOB and by failing to provide any response to Plaintiff's appeal.

20  Significantly, 29 C.F.R. section 2560.503-1 (1)(g), "Manner and Content of

1  Notification of Benefit Determination," requires that plan administrators shall

2  provide a claimant with a written or electronic notification of any adverse benefit

3  determination with the following:

4   "…The notification shall set forth, in a manner calculated to be understood by
    the claimant - -
5       i.   The specific reason or reasons for the adverse determination;
        ii.  Reference to the specific plan provisions on which the
6            determination is based;
        iii. A description of any additional material or information necessary
7            for the claimant to perfect the claim and an explanation of why
             such material or information is necessary;
8       iv.  A description of the plan's review procedures and the time limits
             applicable to such procedures, including a statement of the
9            claimant's right to bring a civil action under section 502(a) of the
             Act following an adverse benefit determination on review;
10      v.   If an internal rule, guideline, protocol or other similar criterion
             was relied upon in making the adverse determination, either the
11           specific rule, guideline, or protocol, or a statement that such a
             rule, guideline, protocol or other similar criterion was relied upon
12           in making the adverse determination and that a copy of such rule,
             guideline, protocol or other criterion will be provided free of
13           charge to the claimant upon request."

14  Defendants violated 29 C.F.R. section 2560.503(1) by failing to meet the listed

15  requirements regarding the manner and content of notification benefit determination,

16  which entitles Plaintiff to pursue additional remedies under ERISA section 502(a)

17  on the basis that the Defendants failed to provide a reasonable claim procedure and

18  therefore, deems Plaintiff to have exhausted all administrative remedies.

19        40.    29 C.F.R. section 2560.503-1 (5) requires that the "claims procedures

20  contain administrative processes and safeguards designed to ensure and to verify that

1   benefit claim determinations are made in accordance with governing plan

2   documents." Plaintiff is informed and believes that Defendants failed to implement

3   proper administrative processes and safeguards, since Defendants intentionally

4   attempted to pay Plaintiff a lesser amount than what the Plan provides and hindered

5   Plaintiff's recovery efforts by issuing inadequate EOB explanations with false and

6   misleading statements and failing to provide responses to the appeals by Plaintiff.

7       41.    On February 02, 2024 Anthem issued the EOB to SJN for the services

8   rendered.  A copy of the EOB is attached as Exhibit 9.  Plaintiff was paid $7,811.91

9   for the total billed charges of $85,500.00.  In other words, Plaintiff was paid

10  approximately 9.14% of the billed charges.  The EOB for the services contained the

11  following pertinent claim payment information within its chart, which is accurately

12  replicated below:

13  Table 2: EOB issued February 02, 2024

| SERVICE CODES | CHARGE | ALLOWED/ QPA | CONTRACTUAL DIFFERENCE | PROVIDER RESP. AMOUNT | EXPL/ANSI CODE(S) | INSURED RESPONSIBILITY AMOUNT | WHAT WE WILL PAY |
|---|---|---|---|---|---|---|---|
| 22856 | $62,500.00 | $3,646.24 $2,991.40 | $57,014.74 | $57,014.74 | AUQ 45 | $0.00 | $5,485.26 |
| 22858 | $20,500.00 | $1,161.11 961.84 | $18,856.45 | $18,856.45 | AUQ 45 | $0.00 | $1,643.55 |
| 69990 | $2,500.00 | $0.00 | $1,816.90 | $1,816.90 | AUQ 45 | $0.00 | $683.10 |
| TOTAL | $85,500 | $4,807.35 | $77,688.09 | $77,688.09 | | $0.00 | $7,811.91 |

19      42.    In processing Plaintiff's claim, the Defendants indicated in their EOB

1   that the claim had been processed based on the federal No Surprise Act[14]. Plaintiff

2   is informed and believes that the Defendants incorrectly processed Plaintiff's claim

3   according to the federal No Surprise Act.  Plaintiff's claim does not fall under the

4   protection of the No Surprise Act and application of the No Surprise Act to Plaintiff's

5   claim was improper.

6         43.    The Center for Medicare & Medicaid Services ("CMS") defines the No

7   Surprises Act as a "federal law that provides protection against getting ***surprise***

8   ***medical bills*** for out-of-network emergency services, some ***out-of-network non-***

9   ***emergency services related to a patient visit to an in-network facility***, and out-of-

10   network air ambulance services." (Emphasis added).[15] The No Surprises Act

11   protects people who are covered under group health plans, group and individual

12   health insurance coverage, as well as carriers that operate under the Federal Health

13   Benefit (FEHB) laws for the following:

14   • Most emergency services

15   • Non-emergency items and services from out-of-network providers ***with***

16     ***respect to*** the patient's visit to certain in-network facilities. (Emphasis added).

17

18   ————————————

14     Explanation Code AUQ on the EOB.

19   15     No Surprise Act Consumer Advocate Toolkit Glossary,

20   www.cms.gov/files/document/nsa-toolkit-glossary.pdf (last visited September 17, 2024).

1    • Services from out-of-network air ambulance service providers.[16]

2    44.    Under the CMS No Surprise Act Consumer Advocate Toolkit Glossary

3    Surprise Bill is defined as an ***unexpected*** balance bill for certain types of out-of-

4    network costs that a consumer's health insurance didn't cover. (Emphasis added.)

5    45.    The No Surprise Act prohibits surprise bills for Non-Emergency

6    services from an out-of-network provider ***delivered as part of a patient's visit to***

7    certain types of participating healthcare facilities as stated by CMS in the No

8    Surprise Act overview of key consumer protections. (Emphasis added) The No

9    Surprise Act does not apply when non-emergency items or services are provided

10   with respect to a patient visit to an out-of-network facility.

11   46.    Patient ASH-GIA was a 40-year-old female ***who presented*** herself to

12   Plaintiff's office (out-of-network provider) with neck pain, upper extremity

13   numbness and patellar hyper-reflexia.  This was a ***non-emergency*** visit.  Upon

14   ***examination and evaluation at Plaintiff's facility*** (an out-of-network facility),

15   ***Plaintiff, an out-of-network provider, scheduled*** Patient ASH-GIA for a

16   neurosurgical operation at El Camino Hospital (which is an in-network facility with

17   Patient ASH-GIA insurance). The No Surprise Act applies to non-emergency items

18   and services from out-of-network providers ***with respect to patient visits*** and

19

20   ───────────────

[16]    No Surprise Act Overview of Key Consumer Protections,
www.cms.gov/files/document/nsa-keyprotections.pdf (last visited July 22, 2024)

– 25 –

prohibits surprise bills for non-emergency services from an out-of-network provider *delivered as part of a patient's visit to certain types of participating healthcare facilities.* This is not a case where Patient ASH-GIA's visit (the surgery performed) by SJN was delivered as part of the Patient ASH-GIA's visit to El Camino Hospital. This was a case where Patient ASH-GIA knowingly presented with symptoms to consult with an out-of-network provider (SJN) at SJN's office. SJN then *scheduled and performed* the surgery event at the El Camino Hospital (an in-network facility). The No Surprise Act does not apply in this case under these facts.  There is no surprise bill here. The application of the No Surprise Act for the determination of the payment of Plaintiff's claim in this case were false and inaccurate as the No Surprise Act is inapplicable to the facts of this case.

47.    Additionally, Defendants underpaid SJN's Claim with the reasoning that the charges exceeds fee schedule/maximum allowable or contracted legislated fee arrangement"[17]. This statement in the EOB is meaningless non sequitur and provides no legitimate explanation or basis for reduction such that an average Plan member would comprehend as to how Defendants computed Plan benefits.  The vague statement that Defendants offered in the EOB does not continue a final determination with respect to the payment of SJN's bills.  Defendants did not even

---

[17]    Explanation Code 45 on the EOB.

1  point to the specific Plan provisions to explain their method for calculating their

2  "contractual difference", "provider responsibility amount" and "what we will pay"

3  amount.  Despite having a duty to do so, Defendants failed to clearly specify reasons

4  for these adverse determinations and reference which plan provision these reasons

5  were based on. Defendants also failed to describe, whether, why, and which

6  additional material or information was necessary to perfect the claim.  Defendants

7  failed to properly describe the Global Medical Plan's review procedures and

8  applicable time limits and failed to include a statement of Plaintiff's right to bring a

9  civil action under section 502(a) of the Act following an adverse benefit

10  determination on review.  Defendants violated 29 C.F.R. section 2560.503-1(1)(g)

11  by issuing woefully deficient EOB.

12      48.    29 C.F.R. section 2560.503-1 (5) requires that "claims procedures

13  contain administrative processes and safeguards designed to ensure and to verify that

14  benefit claim determinations are made in accordance with governing plan documents

15  and that, where appropriate, the plan provisions have been applied consistently with

16  respect to similarly situated claimants." Plaintiff is informed and believes that

17  Defendants have failed to so implement proper administrative processes and

18  safeguards, as Defendants have intentionally attempted to pay Plaintiff a lesser

19  amount than what the Global Medical Plan provides by utilizing the No Surprise Act

20

– 27 –

1  where it has no applicability, and by issuing EOB which contain false and improper

2  processing of the claims.

3  **VIII.  SJN EXHAUSTED ALL ADMINISTRATIVE REMEDIES**

4           **a.    Administrative Remedies Are Exhausted Based On An**

5                  **Improper EOB**

6           49.    For the claim event in this action, Defendants provided an EOB which

7  failed to explain the payment reduction applied with respect to SJN's billing

8  submittal as discussed above. Defendants' explanation in the EOB was meaningless

9  non sequiturs as discussed above and provided no legitimate explanation or basis for

10 the reduction in payment at all. The EOB was woefully deficient in its explanation

11 of the purported grounding for the reduction and/or non-payment of SJN's bill and

12 contained numerous falsities as discussed.  Vague and non-specific statements in the

13 EOB    such    as    "charges    exceed    fee    schedule/maximum    allowable    or

14 contracted/legislated Fee arrangement" or that claim was processed according to the

15 No Surprise Act do not constitute a final determination with respect to the payment

16 of SJN's bill.

17         50.    Defendants' EOB violated the applicable claims procedure regulations

18 governing ERISA Plans as set forth in 29 C.F.R. section 2560.503-1. Of particular

19 significance in this case are the ERISA regulations dealing with "Manner and

20 Content of Notification of Benefit Determination" set forth in 29 C.F.R. section

1   2560.503-1 (g)(1). This section requires that the plan administrator shall provide a

2   claimant with a written or electronic notification of any adverse benefit

3   determination. The regulations require the following:

4       "The notification shall set forth, in a manner calculated to be understood by
        the claimant - -

5               i.   The specific reason or reasons for the adverse determination;

6               ii.  Reference to the specific plan provisions on which the
                     determination is based;

7               iii. A description of any additional material or information necessary
                     for the claimant to perfect the claim and an explanation of why
                     such material or information is necessary;

8               iv.  A description of the plan's review procedures and the time limits
                     applicable to such procedures, including a statement of the

9                    claimant's right to bring a civil action under section 502(a) of the
                     Act following an adverse benefit determination on review;

10              v.   If an internal rule, guideline, protocol or other similar criterion
                     was relied upon in making the adverse determination, either the

11                   specific rule, guideline, or protocol, or a statement that such a
                     rule, guideline, protocol or other similar criterion was relied upon

12                   in making the adverse determination and that a copy of such rule,
                     guideline, protocol or other criterion will be provided free of

13                   charge to the claimant upon request."

14      51.   Defendants, in issuing improper claim determination and pricing

15   reductions, have violated applicable claims procedure requirements by providing

16   insufficient notifications of adverse benefit determination.  Regulations set forth a

17   consequence of the failure by Defendants to comply with the adverse benefit

18   notification requirements in its EOB and/or appeal denials.  29 C.F.R. section

19   2560.503-1(1) provides:

20      "(l) Failure to establish and follow reasonable claims procedures:
        In the case of the failure of a plan to establish or follow claims procedures

– 29 –

1   consistent with the requirements of this section, a claimant shall be deemed to
    have exhausted the administrative remedies available under the plan and shall
2   be entitled to pursue any available remedies under section 502(a) of the Act
    on the basis that the plan has failed to provide a reasonable claims procedure
3   that would yield a decision on the merits of the claim."

4       52.    SJN is deemed by law to have exhausted administrative remedies

5   because Defendants failed to establish and follow reasonable claims procedures as

6   required by ERISA.  Further, Defendants failed to process the claim submitted by

7   Plaintiff in a manner consistent or substantially in compliance with ERISA

8   regulation 29 C.F.R. section 2560.503-1.  Among other things, Defendants in this

9   case:

10  - Failed to set out the specific reason for underpayment of Plaintiff's
      claim in its responses transmitted to Plaintiff during the administrative
11    review process;
12  - Failed to reference the specific Plan provisions upon which its
      underpayment determinations were based;
13  - Failed to give a description of additional materials or information which
      was needed to pursue and perfect the claim, and an explanation of why
      such information was necessary;
14  - Failed to provide Plan documents, or internal rules, guidance, protocols,
      or other criteria upon which the underpayment determinations were
15    based;
16  - Failed to state the underpayment determinations in a manner calculated
      to be understood by Plaintiff; specifically, Defendants' explanation that
17    the claim was paid according to the No Surprise Act and the charges
      exceed fee schedule/maximum allowable or contracted/legislated fee
18    arrangement are meaningless non sequitur and provide no legitimate or
      explanation or basis for the reduction such that an average Plan member
      would comprehend as to how Defendants computed Plan benefits;
19  - Failed to provide a reasonable opportunity for full and fair review of
      the underpayment determinations;
20  - Employed policies designed to unduly hamper the review and appeal of

claim submitted by Plaintiff;

- Acted systematically in a manner which rendered the administrative appeal process a futile and meaningless endeavor specifically by failing to respond to the appeals undertaken by Plaintiff;
- Failed to provide a description of the Plan's review procedure and the time limits applicable to such procedures, including a statement of the Plaintiff's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review.

53.    Defendants have systematically violated the applicable claims procedure regulations governing ERISA Plans as are set forth in 29 C.F.R. §2560.503-1, and in this situation, case law declares that plaintiff is deemed to have exhausted administrative remedies. In *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 719 (9th Cir. 2012), the court pointed out that the ERISA statute itself requires that an administrator who denies a claim must explain the "specific reasons for such denial" and provide a "full fair review" of the denial. These requirements are underscored by the regulation of the claims, which further call for the claimant to be given "information about the denial, including 'the specific plan provisions' on which it is based on 'any additional materials or information necessary for the claimant to perfect the claim.'" *Harlick*, 686 F. 3d. at 719 (quoting 29 C.F.R. § 2560.503-1(g)). *Strom v. Siegel Fenchel & Peddy P.C. Profit Sharing Plan,* 497 F.3d 234, 246 (2d Cir. 2007) (stating the denial of the claim failed to meet the notice requirements of section 1133 to adequately set forth the reasons for denial, the plan's review procedures and rights for further appeal, so the plan administrators were precluded from asserting a failure to exhaust administrative remedies); *Cromer-*

– 31 –

1    *Tyler v. Teitel*, 294 F. App'x 504, 508 (11th Cir. 2008) (finding exhaustion excused

2    because the plan administrator's letter informing the participant that her benefits

3    under the plan were terminated was inadequate; it did not contain a specific reason

4    for the determination, did not refer to specific plan provisions, and did not describe

5    procedures necessary to review the claim)." "[W]hen an employee benefits plan fails

6    to establish or to follow 'reasonable claims procedures' consistent with the

7    requirements of ERISA, a claimant need not exhaust because his claims will be

8    deemed exhausted." *Barboza v. Cal. Ass'n of Pro. Firefighters*, 651 F. 3d 1076 (9th

9    Cir. 2011).

10          **b.     Administrative Remedies Are Exhausted Based on Lack of**

11                   **Response to the Appeals by Plaintiff and Are Exhausted In**

12                   **Fact Due To Plaintiff's Actions**

13          54.    Although SJN was not required to appeal the determination by the

14   Defendants as discussed above, on March 30, 2024, SJN appealed the claim

15   determination by submitting an appeal to Global Medical Response Inc. at 4400

16   State Highway 121, Lewisville, TX 75056 via certified mail and demanded a full

17   and fair review of the claim.  In its appeal letter, SJN sought timely payment for its

18   claim and informed the Defendants that they had improperly processed the claim.

19   SJN informed the Defendants that it was not contracted with the Defendants and did

20

1 not negotiate any discounted settlement with any of the Defendants. A copy of the

2 March 30, 2024 appeal letter is attached hereto as Exhibit 10.

3     55. On April 2, 2024, SJN appealed the claim determination to Anthem, via

4 fax at (877) 551-6183. In its appeal letter, SJN sought timely payment for its claim

5 and informed the Defendants that they had improperly processed the claim. SJN

6 informed the Defendants that it was not contracted with the Defendants and did not

7 negotiate any discounted settlement with any of the Defendants. A copy of the April

8 2, 2024 appeal letter is attached hereto as Exhibit 11.

9     56. On April 2, 2024, SJN representative contacted Anthem's agent Mary

10 P., who confirmed on a recorded call that SJN's claim was processed through the

11 Blue Card Program. The representative also confirmed that SJN was not contracted

12 with the Plan, BCBS, or any of its agents and there was no accepted negotiation on

13 file.[18]

14     57. On April 3, 2024, SJN appealed the claim determination to BCBS-TX

15 via fax at (855) 235-1055. In its appeal letter, SJN sought timely payment for its

16 claim and informed the Defendants that they had improperly processed the claim.

17 SJN informed the Defendants that it was not contracted with the Defendants and did

18

19

20 [18] Plaintiff is in possession of a Reference No. for this call which has not been included due to privacy reasons. The Reference No. will be provided after a Protective Order has been filed with the Court to preserve the Patient's privacy.

not negotiate any discounted settlement with any of the Defendants.  A copy of the April 3, 2024 appeal letter is attached hereto as Exhibit 12.

58.    In all of their appeal letters, Plaintiff specifically asked for the following documents:

1.    All contracts or agreement with SJN, showing we accepted a negotiated discount on the claim

2.    All Plan documentation that demonstrate Defendants have negotiated a binding discount agreement with SJN

3.    All Trading Partner Agreements

4.    The identity of the "Originating Payer" [The Plan]

5.    All origination agreements with Depository Financial Institutions ("DFI")

6.    The "reassociation" and trace information from the Plan

7.    All Business Associate Agreement with all Trading Partners

8.    TPAs "Fee Schedule" for SJN

9.    Repricing agency fee schedule and methodology, in order to determine if a conflict of interest exists

10.    All Master Plan documents, SPDs, Policies, Procedures and Work Instructions required to establish and maintain reasonable claims procedures, as required under ERISA, including but not limited to:

      i.      Documents specifically identifying the adjustment reason utilized in the EOB

      ii.     Defendants' definition and or explanation of all standardized CARC utilized in its ERA

     iii.    Documents specifically identifying a "Legislative Fee Schedule"

11.    All ASO Agreements, including but not limited to:

      i.      Standard schedule of fees for administrative services provided

      ii.     Recovery or recoupment fees

     iii.    All "cost containment", "savings" or "network access" fees

***Defendants failed to respond to any of Plaintiff's appeals in entirety and did not provide the documents requested.***

59.    Plaintiff is informed and believes that Defendants failed to process and pay Plaintiff's claim in accordance with the Global Medical Plan terms.  Defendants also failed to address SJN's appeal in accordance with the Global Medical Plan terms and failed to honor SJN's request for documents on multiple occasions. Furthermore, Defendants failed to properly investigate SJN's claims for fiduciary violations raised in its appeals.  Additionally, Defendants failed to comply with the

– 35 –

1 Health Insurance Portability and Accountability Act (HIPAA) by making false

2 statements regarding discounts, concealing material facts, and not investigating

3 allegations made by SJN. Defendants' appeal process was futile and did not result

4 in any additional payments.

5     60.    Defendants' systematic actions have rendered Defendants'

6 administrative appeal process a futile and meaningless endeavor. The plaintiff is to

7 be deemed by law to have exhausted administrative remedies. Moreover, Plaintiff

8 has completed the Defendants' administrative appeal process by filing an appeal to

9 no avail on three separate occasions to Defendants. Thus, Plaintiff has also exhausted

10 administrative remedies in fact through Plaintiff's actions in engaging in

11 Defendants' futile appeal process.

12 **IX.**   **ASSIGNMENTS TO HEALTH CARE PROVIDERS ARE FAVORED**

13       **UNDER ERISA LAW**

14     61.    In *Misic v. Bldg. Services Employees Health & Welfare Trust,* 789 F.2d

15 1377 (9th Cir. 1989) the Ninth Circuit Court determined that assignments of patient

16 benefits under healthcare plans are a favored practice to ensure efficiency in the

17 delivery of healthcare services. "[P]ermitting the assignment of benefits claims to

18 healthcare providers makes it easier for plan participants to finance healthcare and

19 therefore advances the congressional intent behind ERISA." *Misic, supra,* at 1378.

20 Assignees of a claim for collection of healthcare benefits have been permitted to

– 36 –

1   bring suit based on derivative standing. *See also, Simon v. Blue Behav. Health, Inc.,*

2   208 F.3d 1073, 1081 (9th Cir. 2000) (extending derivative standing to healthcare

3   providers to whom beneficiaries assigned their benefits claims for medical care from

4   such providers). Granting standing to healthcare providers furthered the

5   congressional purposes behind ERISA because it enhanced the efficiency and ease

6   of billing among all interested parties. *See id.* The authority of *Misic* and *Simon* was

7   recently reaffirmed in *Bristol SL Holdings, Inc. v. Cigna Health and Life Ins. Co.,*

8   (9th Cir. No. 20-56122, January 14, 2022).

9   **X.    DEFENDANTS HAVE WAIVED AND/OR ARE ESTOPPED FROM**

10  **ASSERTING ANY "ANTI-ASSIGNMENT" CLAUSES CONTAINED**

11  **IN THE PATIENT'S HEALTHCARE PLAN**

12  62.    Under federal ERISA law, a healthcare plan and its claim

13  administrators are subject to specific rules where benefits are to be denied with

14  respect to the claims of a healthcare provider such as SJN.

15  63.    When making a claim determination under ERISA, "an administrator

16  may not hold in reserve a known or reasonably knowable reason for denying a claim

17  and give that reason for the first time when the claimant challenges a benefits denial

18  in court." *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*,

19  770 F.3d 1282, 1296 (9th Cir. 2014) ("*Spinedex*"); *Harlick v. Blue Shield of Cal.*, 686

20  F.3d 699, 719 (9th Cir. 2012) ("*Harlick*"). "A plan administrator may not fail to give

– 37 –

1  a reason for a benefits denial during the administrative process and then raise that

2  reason for the first time when the denial is challenged in federal court[.]" See *id.*

3  64.  Anti-assignment clauses in ERISA health plans are valid and

4  enforceable." *Spinedex*, *supra,* 770 F.3d at 1296. However, a plan administrator can

5  waive the right to enforce an anti-assignment provision. *Id.* at 1296–97

6  (acknowledging the right to assert waiver, but concluding on the specific facts of

7  *Spinedex* that the defendant-claims administrator was not required to raise the anti-

8  assignment provision during the administrative claim process in that case because

9  "there [wa]s no evidence that [the claims administrator] was aware, or should have

10  been aware, during the administrative process that [the plaintiff-medical provider]

11  was acting as its patient's assignee.

12  65.  SJN has pleaded waiver facts in this action in accordance with *Spinedex*

13  and *Harlick*. SJN's billing form included an "X" on Box 27 in the Form 1500 which

14  notified the claim administrators that the claim was being pursued by way of an

15  assignment. Defendants' EOB was addressed to Plaintiff. Moreover, the Defendants

16  paid the claim submitted by SJN to SJN (albeit underpaid). These facts establish that

17  Defendants waived any anti-assignment clause, if any, within the Plan.

18  66.  Defendants are estopped from asserting anti-assignment by the fact that

19  during the claim administrative review process, they represented that SJN was

20  eligible to receive plan benefits and paid benefits and did not raise the anti-

1   assignment from the beginning of the claim submission when the claim was

2   submitted and during the appeal process.  Furthermore, even though SJN was not

3   required to appeal the claim determination by the Defendants, SJN appealed the

4   claim determination on three separate occasions and provided copies of the

5   assignment executed by the Patient along with the appeals. These facts establish an

6   estoppel and waiver of any alleged anti-assignment.  The authority of *Spinedex* and

7   *Harlick* on the waiver and estoppel issues was reaffirmed in *Beverly Oaks Physicians*

8   *Surgery Center, LLC v. Blue Cross and Blue Shield of Illinois,* 983 F. 3d 435 (9th Cir.

9   2020) ("*Beverly Oaks*").  Under *Beverly Oaks*, the promise that SJN was eligible to

10  receive plan benefits as an out-of-network healthcare provider is sufficient to estop

11  Defendant from asserting a plan anti-assignment clause in this case.

12  **XI.   SJN HAS STANDING TO PURSUE ITS CLAIM AGAINST**

13  **DEFENDANTS UNDER ERISA FOR THE PAYMENT OF BENEFITS**

14  **AS WELL AS FOR ATTORNEY'S FEES**

15  67.   Defendants are the proper party defendant for an ERISA benefits

16  recovery action. *See, Harris Trust & Sav. Bank v. Salomon, Smith Barney, Inc.,* 530

17  U.S. 238, 247 (2000); *Cyr v. Reliance Standard Life Ins. Co.,* 647 F.3d 1202 (9th Cir.

18  2011).

19  68.   ERISA governs all aspects of health and medical benefits under ERISA

20  plans and authorizes a civil action to recover unpaid benefits and attorney's fees.

1   SJN has standing to bring this lawsuit arising from its Assignments from Patient.

2   **XII.   BOTH §§502(A)(1)(B) AND (A)(3) CAUSES OF ACTION MAY BE**

3   **SIMULTANEOUSLY PLED, PURSUED, AND BE REMEDIED BY A**

4   **PLAINTIFF WITH A VALID ASSIGNMENT OF BENEFITS**

5   **a.   Out-Of-Network Medical Providers, Such As Plaintiff, Are Allowed**

6   **To Pursue Claims And Receive Benefits Through Valid Assignment**

7   **Under §§502(A)(1)(B) And (A)(3)**

8   69.     In 2024, the 9th Circuit Court of Appeals reminded the public of its clear

9   consensus that healthcare providers have the ability to pursue ERISA actions via

10  valid assignment, by reversing and remanding the district court's incorrect dismissal

11  of an ERISA action brought by an out-of-network surgery center, opining that "First,

12  does a healthcare provider have derivative authority to enforce ERISA's protections

13  if it has received a valid assignment of rights? . . . Longstanding precedent answers

14  'yes' to the first question." *South Coast Specialty Surgery Center Inc. v. Blue Cross*

15  *of California*, No. 22-55717, 4* (9th Cir. 2024) (for publication).  The 9th Circuit

16  Court of Appeals reasoned that recognizing such derivative authority to sue,

17  "[s]erves ERISA's purpose by 'making it unnecessary for health care providers to

18  evaluate the solvency of patients before commencing medical treatment, and by

19  eliminating the necessity for beneficiaries to pay potentially large medical bills and

20  await compensation from the plan.'" *Id.* at 16-17 (quoting the case of *Misic v.*

– 40 –

1   *Building Service Employees Health*, 789 F.2d 1377 (9th Cir. 1986)).

2       70.   The long-standing precedent that the 9th Circuit Court of Appeals is

3   referring to includes seminal cases going as far as nearly a decade back.  In 2014,

4   the 9th Circuit specifically opined on the issue of assignment for an out-of-network

5   provider asserting the right to seek benefits and breaches of fiduciary duty on behalf

6   of Plan participants in *Spinedex*.  In that case, the plaintiff, Spinedex Physical

7   Therapy, an out-of-network provider, provided medical services to Plan participants,

8   who belonged to the United Healthcare of Arizona, Inc., insurance policy

9   ("United"), were required to submit bills to their respective United Plans for

10  reimbursement.  As part of Spinedex's client intake process for those services, Plan

11  beneficiaries assigned their right to seek payment of Plan benefits to Spinedex.

12  United denied some of Spinedex's claims, and Spinedex, as an assignee, sued the

13  Plans and United seeking payment of benefits under ERISA § 502(a)(1)(B) and

14  asserting breaches of fiduciary duty under ERISA §502(a)(3). *Id.* On appeal, the 9th

15  Circuit reversed the district court's ruling on that issue, holding that, "plaintiffs

16  assigned their claims to Spinedex.... [I]t is black-letter law that an assignee has the

17  same injury as its assignor for purposes of Article III." *Id.* at 1291.[19]

18  _____

19  [19]   The 9th Circuit Court noted that *Spinedex* was unable to assert breach of
    fiduciary duty under assignment because Spinedex had not effectively argued that
    the sparce language used for Spinedex's assignment of benefits, "assignment of
20  rights and benefits" indicated to the assignor patients that the word "rights" meant
    'right to bring claims for breach of fiduciary duty.' *Spinedex*, 770 F.3d 1282 at 1292.

– 41 –

71.   Accordingly, a district court in the 9th Circuit, as illustrated in *Metcalf v. Blue Cross Blue Shield of Michigan*, 57 F. Supp.3d 1281 (D. Or. 2014), ruled that Metcalf, an out-of-network medical service provider with a valid assignment, had the right to receive benefits and pursue claims through his assignment under both §§502(a)(1)(B) and (a)(3) of ERISA. This decision underscored the court's recognition that assignments of benefits can confer legal standing upon healthcare providers to assert claims and seek remedies on behalf of patients under ERISA, ensuring that medical providers can effectively advocate for their rights to reimbursement and pursue lawful recourse through the assignment mechanism.

> "Whether Congress has provided Metcalf with a cause of action boils down to the original question—whether the term "beneficiary" in §§ 1132(a)(1)(B) & (a)(3) encompasses assignees—albeit now as a question on the merits, to be answered using "traditional tools of statutory interpretation." See *Lexmark*, 134 S.Ct. at 1387. The plain text of the statute defines a "beneficiary" as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(8). To Judge Stewart, this definition was "sufficiently broad to include a person such as Metcalf who has been designated by participants ... to receive benefits and pursue claims." F & R at 1295. As a matter of plain text, this Court agrees."

---

The lack of notification to the assignor (thereby the ignorance of the assignor) of the "would-be given" right to assert a breach of fiduciary duty claim rather than the inability to give such right is what the 9th Circuit determined to be fatal to the claim. Contrastingly, in this case, Plaintiff's detailed assignments of benefits outright states that it includes the right to bring "ERISA breach and fiduciary duty claims, and other legal and/or administrative claims," properly notifying the assignor patient Plan members.  (Ex. 1.)

1    *Id.* at 1287 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S.

2    118, 1387 (2014) (in-text citations omitted).  The 9th Circuit unequivocally affirms

3    that healthcare providers holding a valid assignment of rights are entitled to enforce

4    all ERISA protections properly assigned to them.

5         72.    In regard to the above legal conclusion, the 9th Circuit is not alone in its

6    reasoning. All federal circuits allow providers to claim benefits and other ERISA

7    protections under a valid assignment of Plan benefits from Plan members.

8    Exemplifying the federal courts' general understanding on assignment for providers

9    seeking relief based on ERISA §502 provisions, *North Jersey Brain & Spine Center*

10   *v. Aetna, Inc.,* 801 F.3d 369 (3rd Cir. 2015) joined five other federal court of appeals

11   in holding that a patient's assignment of benefits to his or her health care provider is

12   sufficient to confer standing upon the provider to sue for non-payment of those

13   benefits under §502(a),

14          "As a matter of federal common law, when a patient assigns payment of
            `insurance benefits to a healthcare provider, that provider gains standing to
15          sue for that payment under ERISA §502(a). An assignment of the right to
            payment logically entails the right to sue for nonpayment . . . After all, the
16          assignment is only as good as payment if the provider can enforce it."

17   *Id.* at 372. In so deciding, the 3rd Circuit indicated that it was guided by ERISA's

18   intent to protect the interests of participants, transferring the burden of payment to

19   the providers who are better situated and financed to pursue unpaid claims, joining

20   the 1st, 5th, 6th, 9th, and 11th Circuits in its conclusion. *Id.* at 374. The plain text of

– 43 –

1   ERISA, the general federal interpretation of ERISA, and the 9th Circuit interpretation

2   of ERISA all allow for out-of-network medical service providers with a valid

3   assignment, such as Plaintiff, to pursue claims and receive benefits under both

4   §§502(a)(1)(B) and (a)(3) remedial provisions.

5       **b.  Plaintiffs May Plead Both §§502(A)(1)(B) and §§502(A)(3)**

6           **Simultaneously**

7       73.   Careful contextualization is required when reviewing past judicial

8   opinions on ERISA remedies, as, over the years, Courts have shifted authoritative

9   weight and have even removed binding authority from once seminal cases to

10  increasing support of the rightful ability for plaintiffs everywhere to seek recovery

11  for all harms.   The ability for plaintiffs to plead both §§502(a)(1)(B) and (a)(3)

12  remedial provisions has been addressed several times by the Supreme Court, with

13  the 9th Circuit Court of Appeals providing guidance on two seemingly shifting

14  perspectives between 1996 and 2011.   In 1996, the Supreme Court ruled on *Varity*

15  *Corp. v. Howe*, 516 U.S. 489 (1996) ("*Variety*").   In this ruling, the Supreme Court

16  stated that "where Congress elsewhere provided adequate relief for a beneficiary's

17  injury, there will likely be no need for further equitable relief, in which case such

18  relief *normally* would not be '*appropriate*.'"  *Variety Corp. v. Howe*, 516 U.S. 489,

19  515 (1996) (emphasis added).   Notably, *Variety* did not eliminate the right for a

20  private cause of action for breach of fiduciary duty when another remedy is available

1    and merely limited equitable relief to that which would be normally appropriate.

2          74.     Post-*Variety,* from 1996-2011, several federal circuits including the

3    2nd, 6th, 7th, and 11th Circuits, [20] correctly allowed for the pleading of both

4    §§502(a)(1)(B) and (a)(3) remedial provisions.  However, some Circuits, including

5    the 9th Circuit, had misinterpreted *Variety* to exclude §§502 (a)(3) relief if §§502

6    (a)(1)(B) was viable.  Clarification of this widespread misconception was not

7    granted by the Supreme Court until 2011, with its ruling on *CIGNA Corp. v. Amara*

8    *et al.,* 563 U.S. 421 (2011) ("*Amara*"), which concluded not only that §502(a)(1)(B)

9    and (a)(3) claims may be pled simultaneously, but also that monetary relief may also

10   be granted through §502(a)(3) by means of equitable theories such as Plan

11   reformation, equitable estoppel, and "surcharge."  The Supreme Court's ruling on

12   *Amara* persuaded other remaining circuits that pleading claims under both sections

13

14   ───────────
     20     Such decisions included: *Kunkel v. Empire Blue Cross and Blue Shield*, 274
15   F.3d 76, 90 (2d Cir. 2001) ("*Variety*…did not eliminate a private cause of action for
     breach of fiduciary duty when another potential remedy is available; instead, the
16   district court's remedy is limited to such equitable relief as is considered
     appropriate."); *Abbruscatto v. Empire Blue Cross & Blue Shield*, 274 F.3d 90, 93
17   (2d Cir. 2001); *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 89 (2nd.
     Cir. 2001).   The 7th Circuit also opined on *Variety's* statement regarding
18   simultaneous pleading, "Further, nothing in *Varity Corp.* overrules federal pleading
     rules…a plaintiff may plead claims hypothetically or alternatively. To dismiss an
19   ERISA plaintiff's § 1132(a)(3) claim as duplicative at the pleading stage of a case
     would, in effect, require the plaintiff to elect a legal theory and would, therefore,
20   violate [the Federal Rules of Civil Procedure]."   *Black v. Long Term Disability*
     *Insurance*, 373 F.Supp.2d 897, 902–03 (E.D. Wis. 2005) (internal citations omitted);
     *Geiger v. UNUM Life Insurance Co.*, 213 F. Supp. 2d 813, 818 (N.D. Ohio 2002).

1  simultaneously is permissible, with the age-old caveat that a plaintiff cannot use the

2  guise of equitable relief to obtain duplicative remedies for a single injury. *Moyle v.*

3  *Liberty Mut. Ret. Benefits Plan*, 823 F.3d 948, 959–62 (9th Cir. 2016) ("*Moyle*");

4  *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 726 (8th Cir. 2014) ("*Silva*"); cf. *Rochow*

5  *v. Life Ins. Co. of N. Am.,* 780 F.3d 364, 370 (6th Cir. 2015); *Peters v. Aetna Inc.,* 2

6  F.4th 199 (4th Cir. 2021).

7       75.    In 2016, the 9th Circuit Court of Appeals emphasized the profound

8  effect of the *Amara* Supreme Court ruling on ERISA cases, in *Moyle v. Liberty Mut.*

9  *Retirement Ben. Plan*, 823 F.3d 948 (9th Cir. 2016) ("*Moyle*") (holding that claims

10  under 29 U.S.C. §1132(a)(1)(B) and §1132(a)(3) may be simultaneously pled and

11  pursued, reversing the district court's grant of summary judgment for the Defendants

12  under 29 U.S.C. §1132(a)(3), and remanding the case for determinations of fact and

13  equitable relief in the form of reformation and surcharge).  Acknowledging and

14  retracting past judicial inconsistencies, the 9th Circuit Court of Appeals also clarified,

15  "Some of our pre-*Amara* cases held that litigants may not seek equitable remedies

16  under §1132(a)(3) if §1132(a)(1)(B) provides adequate relief.  However, those cases

17  are now "clearly irreconcilable" with *Amara* and are no longer binding."  *Moyle* at

18  948 (internal citations omitted).[21]

19  _____

20  [21]    The 9th Circuit Court of Appeals lists model cases that are irreconcilable with
*Amara* and are thus no longer binding, including the following: *Ford v. MCI*
*Commc'ns Corp. Health & Welfare Plan*, 399 F.3d 1076, 1083 (9th Cir.2005)

76.     In *Moyle*, Plan participant plaintiffs brought a punitive class action against their retirement benefit Plan, Plan administrator, and employer (defendants) for violations of ERISA, asserting, among other causes of action, (1) payment of benefits pursuant to 29 U.S.C. §1132(a)(1)(B) and (2) equitable remedies under 29 U.S.C. §1132(a)(3) in the form of reformation and surcharge.   In reversing the district court ruling, the 9th Circuit Court of Appeals reprimanded the district court for "applying *Variety* and giv[ing] *Amara* short shrift even though the latter is controlling authority" and elaborated, "while *Amara* did not explicitly state that **litigants may seek equitable remedies under §1132(a)(3) if §1132 provides adequate remedies**, *Amara's* holding in effect does precisely that."  *Id.* at 960. (Emphasis added.)   The 9th Circuit Court of Appeals explained that allowing Appellants to pursue claims under both 29 U.S.C. §1132(a)(1)(B) and §1132(a)(3) simultaneously is "consistent with ERISA's intended purpose of protecting participants' and beneficiaries' interests."  *Moyle* at 948 (referencing 29 U.S.C. §1001 and quoting *Variety*, 516 U.S. at 513).   The 9th Circuit Court of Appeals concluded, "**Appellants may pursue simultaneous claims under 29 U.S.C. §1132(a)(1)(B) and §1132(a)(3).**" *Id.* at 965.  (Emphasis added.)   Thus, the 9th

---

("Because Ford asserted specific claims under 29 U.S.C. §§ 1132(a)(1)(B) and 1132(a)(2), she cannot obtain relief under 29 U.S.C. § 1132(a)(3)."), overruled on other grounds, *Cyr v. Reliance Standard Life Ins. Co.*, 642 F.3d 1202 (9th Cir.2011).

1   Circuit, in accordance with federal circuit courts, has clearly ruled that plaintiffs can

2   simultaneously plead both ERISA remedial provisions §§502 (a)(1)(B) and (a)(3).

3        77.    Therefore, based on the above, SJN is bringing an action against the

4   Defendants under ERISA §§502 (a)(1)(B) and (a)(3).

5                           **<u>COUNT ONE</u>**

6   **<u>(Enforcement Under 29 U.S.C. § 1132 (a)(1)(B) For Failure To Pay ERISA</u>**

7   **<u>Plan Benefits And For Recovery Of Reasonable Attorney's Fees And Costs</u>**

8                 **<u>Under 29 U.S.C. § 1132 (G)(1))</u>**

9        78.    The allegations of the prior paragraphs of this Complaint are hereby

10  incorporated by reference in this First Count as if fully set forth at length.

11       79.    This cause of action is alleged by Plaintiff for relief in connection with

12  claim for medical services rendered in connection with the Global Medical Plan.

13       80.    SJN seeks to recover ERISA Plan benefits and enforce rights to benefits

14  payment under 29 U.S.C. § 1132 (a)(1)(B); and under 29 U.S.C. § 1132 (g)(1) for

15  recovery of reasonable attorney's fees and costs.  SJN has standing to pursue this

16  claim as the assignee of member benefits.  As the assignee of benefits, Plaintiff is a

17  "beneficiary" entitled to collect benefits and is the "claimant" for the purposes of the

18  ERISA statute and regulations.  ERISA authorizes actions under 29 U.S.C. § 1132

19  (a)(1)(B) to be brought directly against the Defendants as the parties with actual

20  control over the benefit and payment determinations with respect to SJN's claims.

1    81.    By reason of the foregoing, SJN is entitled to recover ERISA benefits

2 due and owing in an amount to be proven at trial, and SJN seeks recovery of such

3 benefits by way of the present action.

4    82.    29 U.S.C. § 1132 (g)(1) authorizes the Court to allow recovery of

5 reasonable attorney's fees and costs incurred in this action.  SJN has incurred, and

6 continues to incur, attorney's fees and costs in its pursuit of benefit, and is entitled

7 to recover its reasonable attorney's fees and costs in an amount to be proven at trial.

8                        <u>**COUNT TWO**</u>

9    <u>**(Breach of Fiduciary Duties of Loyalty and Due Care in Violation of ERISA**</u>

10   <u>**29 U.S.C § 1132(a)(3)) and for Recovery Of Reasonable Attorney's Fees And**</u>

11              <u>**Costs Under 29 U.S.C. § 1132 (G)(1))**</u>

12   83.    The allegations of the prior paragraphs of this Complaint are hereby

13 incorporated by reference in this Count Two as if fully set forth at length.

14   84.    Pursuant to 29 U.S.C. § 1132(a)(3), a civil action may be brought by

15 "a participant, beneficiary, or fiduciary to (A) enjoin any act or practice which

16 violates any provision of this subchapter or the terms of the plan, or (B) to obtain

17 other appropriate equitable relief (i) to redress such violations or (ii) to enforce any

18 provisions of this subchapter or the terms of the plan."

19   85.    Plaintiff, as an assignees of ERISA members and beneficiaries under

20 the Plan, is entitled to assert a claim for relief for the Defendants' breach of

1  fiduciary duty of loyalty and care under 29 U.S.C. § 1104(a)(1)(A) and (B).

2  　　　　86.　　The Defendants are ERISA fiduciaries of the Global Medical Plan

3  within the meaning of 29 U.S.C. § 1002(21)(A) because, at a minimum, they

4  exercise authority or control respecting management or disposition of the Plan

5  assets.

6  　　　　87.　　As an ERISA fiduciary, the Defendants were required to make claim

7  payment decisions under the Global Medical Plan for the exclusive purpose of

8  providing benefits to participants and beneficiaries, including Plaintiff as their

9  assignee, and defraying reasonable expenses in administering the Plan.  29 U.S.C.

10  § 1104(a)(1)(A).  This duty requires Defendants to avoid self-dealing or financial

11  arrangements that benefit the fiduciary at the expenses of its beneficiaries.

12  　　　　88.　　As an ERISA fiduciary, the Defendants also owed and owe Plaintiff

13  a duty of care, defined as an obligation to act prudently, with the care, skill,

14  prudence and diligence that a prudent fiduciary would use in the conduct of an

15  enterprise of like character.  29 U.S.C. § 1104(a)(1)(B).

16  　　　　89.　　As an ERISA fiduciary, Defendants owed Plaintiff a duty to furnish,

17  upon written request of any participant or beneficiary, a copy of the latest updated

18  summary plan description, and the latest annual report, any terminal report, the

19  bargaining agreement, trust agreement, contract, or other instrument under which

20  the plan is established or operated in accordance with ERISA Section

1    104(b)(4).  Plaintiff submitted a formal written request for such documents via

2    Plaintiff's Appeal on three separate occasions to all Defendants.   ERISA Section

3    502(c)(1)(B) provides that if the administrator fails to provide requested

4    documents within 30 days, a court may hold the administrator personally liable to

5    the affected participant or beneficiary for up to $110 per day for each violation.

6        90.    As an ERISA fiduciary, the Defendants were also prohibited from

7    causing the Plan to engage in any transaction Defendants know or should know

8    constitutes a transfer to, or use by or for the benefit of the Defendants any of the

9    Plan's assets and must not deal with the Plan assets in the Defendants' own interest

10   or for its own account in accordance with 29 U.S.C. § 1106(a)(1)(D) and (b)(1).

11       91.    Defendants violated their ERISA duties of loyalty and care, by

12   engaging in prohibited actions alleged in this Complaint.

13       92.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff is

14   entitled to equitable relief to remedy Defendants' self-dealing and other violations

15   of their ERISA fiduciary duties, including declaratory and injunctive relief.

16   Plaintiff is also entitled to seek equitable relief under ERISA § 409(a), 29 U.S.C.

17   § 1109(a), including that Defendants restore to the ERISA Plan any profits

18   Defendants improperly earned through use of Plan assets, that the Global Medical

19   Plan be re-written to provide more clarity as to its Amount calculations, that

20   Defendants honor the rates provided through the verification process, that

1  Defendants immediately cease improperly deeming certain amounts listed in their

2  EOB as the "Contractual Difference" on behalf of all Plan members; and under 29

3  U.S.C. § 1132 (g)(1) for recovery of reasonable attorney's fees and costs.

4  **<u>PRAYER</u>**

5  WHEREFORE, Plaintiff pray for judgment against Defendants as follows:

6  1. Declaring that Defendants have breached the terms of the Plan with

7     regard to out-of-network benefits;

8  2. Awarding Plaintiff Damages against the Defendants in an amount to be

9     proven at trial in connection with the healthcare benefits claim, properly

10    due and payable with respect to the services rendered to Patient ASH-

11    GIA under the terms of the Global Medical Plan at issue in this case,

12    including such relief provided by 29 U.S.C. § 1132 (a)(1)(B);

13 3. Awarding injunctive and declaratory relief to prevent the Defendants'

14    continuing actions detailed herein that are unauthorized and prohibited

15    by the Plan and applicable law;

16 4. Declaring that, by reason of the Defendants' failure to comply with

17    applicable claims procedure regulations, and that "deemed exhaustion"

18    under such regulations is in effect as a result of Defendants' actions;

19 5. Declaring that the Defendants violated their fiduciary duties under 29

20    U.S.C. § 1104, and awarding injunctive, declaratory and other equitable

1   relief to redress such violations, including such relief provided by 29

2   U.S.C. § 1132(a)(3);

3   6. Appointing an independent fiduciary at the expense of the Defendants to

4   re-adjudicate Plaintiff's claim processed by Defendants in this case, and

5   to reimburse to Plaintiff all amounts required to reimburse Plaintiff

6   pursuant to the Plan documents, including interest;

7   7. Ordering Defendants to pay all the reasonable costs and expenses of the

8   independent fiduciary in readjudicating the claim and the reasonable

9   costs and expenses associated with correcting all improperly adjudicated

10   claims that are identified in this Complaint;

11   8. Awarding lost profits, contractual damages, and compensatory damages

12   in such amounts as the proofs at trial shall show;

13   9. Awarding restitution for payments improperly withheld by Defendants;

14   10. Declaring that Defendants have violated the terms of the Plan that is at

15   issue in this case and/or policies of insurance that are providing coverage

16   for the Patient;

17   11. Awarding Plaintiff up to $110 per day as of April 3, 2024 for violation of

18   ERISA Section 104(b)(4) per ERISA Section 502(c)(1)(B);

19

20

– 53 –

12. Awarding reasonable attorney's fees, as provided by common law, federal or state statute or equity, including 18 U.S.C. § 1964(c) and 29 U.S.C. § 1132(g);

13. Awarding the costs of the suit;

14. Awarding pre-judgment and post-judgment interest as provided by common law, federal, or state statute or rule, or equity; and

15. Awarding all other relief to which Plaintiff is entitled.

**Dated:** September 30, 2024

Respectfully submitted,

**WILLIAMS WOLLITZ HAKAKIAN PC**

By:   /s/ Mina Hakakian

Mina Hakakian,
Attorneys for Plaintiff California Spine and Neurosurgery Institute dba San Jose Neurospine

– 54 –